**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MELISSA ARMSTRONG *et al.*, | Civil Action No. 3:20-CV-3150-M LEAD CASE |
| Plaintiffs, | |
| | (Consolidated with Civil Action No. 3:21-CV-01484-M) |
| -v- | |
| KIMBERLY-CLARK CORPORATION, | JUDGE BARBARA M.G. LYNN |
| Defendant. | |

**NATIONAL FIRE & MARINE INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF ITS MOTION TO INTERVENE**

**Table of Contents**

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ...................................... 3

    A.   The Underlying Action and Settlement Agreement................................... 3

    B.   The Class Action Settlement Insurance Policy ...................................... 4

    C.   The Unprecedented Surge of Programmatic Fraud in Class Action Claims
        Administration ................................................................................ 5

    D.   Kimberly-Clark and National Fire Express Concerns Regarding Kroll's Proposed
        Findings......................................................................................... 7

    E.   Fraud Expert Corroborates National Fire's Concerns................................. 9

        1.   The Settlement presents a significant risk of fraudulent claims.......................... 11

        2.   Kroll's rule-based methodology is fundamentally flawed and
            ineffective against sophisticated programmatic fraud.......................... 12

        3.   Kroll's flawed methodology risks the validation of nearly half a million
            fraudulent claims, resulting in millions in improper payments.......................... 13

        4.   ClaimScore can deliver a precise fraud determination within 30 days using
            Advanced AI Analysis....................................................................... 14

    F.   The Parties and Kroll Decline to Address Substantial Fraud Concerns .................. 16

III.   ARGUMENTS AND AUTHORITIES ......................................................... 17

    A.   National Fire Is Entitled to Intervene as of Right ...................................... 18

        1.   National Fire's motion is timely.......................................................... 18

        2.   National Fire possesses a protectable interest in the subject matter
            of this lawsuit ................................................................................ 21

        3.   Denying intervention will impair National Fire's interest .................................. 22

        4.   The existing parties have refused to adequately protect
            National Fire's interest ..................................................................... 23

    B.   Alternatively, the Court Should Permit National Fire to Intervene ............................
        Under Rule 24(b) ........................................................................... 24

IV.   REQUEST FOR ORAL ARGUMENT……………………………………………….25

V.    CONCLUSION AND PRAYER ...................................................................... 25

## Table of Authorities

<u>**Cases**</u>

*Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318 (5th Cir. 1986) ...................................... 19

*Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179 (2022) ...................................... 24

*Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014) ................................................................. 17, 18

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .................................................................... 21

*Diaz v. S. Drilling Corp.*, 427 F.2d 1118 (5th Cir. 1970) ........................................................ 19

*Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996) ........................................................ 19

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ......................................... 21

*In re Lease Oil Antitrust Litig.*, 570 F.3d 244 (5th Cir. 2009) .................................................... 22

*Jimenez v. Artsana USA, Inc.*, No. 21-cv-7933 (S.D.N.Y.) ....................................................... 9

*Kurtz v. Kimberly-Clark Corp.*, No. 14-cv-1142 (E.D.N.Y.) ...................................................... 8

*Labrew v. A&K Truckline, Inc.,* No. 2:23-CV-079-Z-BR, 2023 U.S. Dist. LEXIS 201420 (N.D. Tex. Nov. 9, 2023) ........................................................................................................ 22

*McDonald v. E.J. Lavino Co.*, 430 F.2d 1065 (5th Cir. 1970) .................................................... 18

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d (5th Cir. 1984) ................ 24

*Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005) ................................................................... 22

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) ......................................................... 18, 19, 22

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ........................................................ 18

*Swann v. City of Dallas*, 172 F.R.D. 211 (N.D. Tex. 1997) ...................................................... 22

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015) ......................................................... 17, 21

*Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 332 F.3d 815 (5th Cir. 2003) ......... 19

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972) ................................................. 24

*WalMart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562 (5th Cir. 2016).. 18, 19

**<u>Rules</u>**

Fed. R. Civ. P. 24(a)(2) ................................................................................................ 18

Fed. R. Civ. P. 24(b) .................................................................................................... 24

## Use of Generative Artificial Intelligence

Pursuant to Local Rule 7.2(f), generative artificial intelligence was used to improve syntax and enhance the clarity and readability of text that was originally drafted by counsel. No legal research or citation generation was performed by generative artificial intelligence, and all substantive content and citations were prepared by counsel.

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 24, National Fire & Marine Insurance Company ("National Fire") respectfully moves to intervene in this action to safeguard its rights and ensure that the settlement administrator, Kroll Settlement Administration, LLC ("Kroll"), does not erroneously validate millions of dollars in fraudulent claims from non-existent class members.  National Fire issued a class action settlement insurance policy to Defendant Kimberly-Clark Corporation ("Kimberly-Clark"), under which National Fire is obligated to pay valid claims as defined by, and subject to, the policy's terms and conditions.

The prevalence of sophisticated, programmatic fraud targeting class action settlements has escalated dramatically in recent years.  Fraudsters—often leveraging advanced technology and operating as part of international criminal networks or even state-sponsored enterprises— have developed methods that can overwhelm traditional fraud detection systems.  In this case, it appears that these evolving threats have outmatched Kroll's fraud detection protocols.

Kroll has indicated its intent to validate approximately 22% of the submitted claims—a figure that is approximately 440 to 4,440 times the percentage of valid claims identified in recent, comparable class action settlements.  In response to these alarming results, National Fire retained Bryan Heller, a recognized expert in class action settlement claims fraud, to review Kroll's findings and methodologies.  Mr. Heller concluded that Kroll's fraud detection methods

are fundamentally flawed and are likely to result in the improper validation of nearly 500,000 fraudulent claims, potentially exposing National Fire to millions of dollars in unwarranted liability.  As detailed in Mr. Heller's declaration, his conclusions are supported by a comparative analysis utilizing a representative dataset of 38 million claims from his company's proprietary database.[1]

National Fire promptly raised these concerns with counsel for Plaintiffs and Kimberly-Clark, urging them to instruct Kroll to employ additional, more robust fraud detection measures. National Fire also offered to cover all associated costs.  Mr. Heller's company, ClaimScore, LLC ("ClaimScore"), stands ready to deliver a comprehensive and accurate assessment of fraudulent claims within 30 days of receiving the relevant data.  The settlement agreement expressly authorizes Plaintiffs and Kimberly-Clark to direct Kroll to take such action.  Nevertheless, both parties have refused to do so.  Their refusal is particularly troubling in light of the compelling evidence presented in Mr. Heller's declaration and suggests that they may believe National Fire alone will bear the financial consequences of any fraudulent claims.

Although the case has been administratively closed, the Court expressly retained jurisdiction over matters relating to the settlement agreement and Kroll's administration of claims.  The parties' refusal to act has left National Fire with no choice but to seek intervention to protect its substantial interests and to preserve the integrity of the judicial process, which is threatened by the magnitude of fraudulent claims in this matter.

National Fire respectfully submits that it is entitled to intervene as of right under Rule 24(a) because: (1) this motion is timely; (2) National Fire has a significant, protectable interest in ensuring that only valid claims are paid; (3) that interest will be impaired if intervention is

---

[1] *See* Declaration of Bryan Heller ("Heller Decl."), Exhibit 1, Appx. at 1-62.

denied; and (4) the existing parties have refused—and lack any incentive—to adequately protect National Fire's interests. In the alternative, National Fire requests that the Court grant permissive intervention under Rule 24(b) in the exercise of its sound discretion.[2]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Underlying Action and Settlement Agreement

On October 16, 2020, Plaintiffs Melissa Armstrong and others filed a class action lawsuit against Kimberly-Clark, seeking damages related to their purchases of Cottonelle Flushable Wipes.[3]  The lawsuit was brought on behalf of a putative class of similarly situated consumers. In November 2020, Dawn Rothfeld initiated a similar action in the Eastern District of New York. The Rothfeld case was later transferred and consolidated with the previously filed Armstrong action.[4]

On or about September 22, 2023, Plaintiffs and Kimberly-Clark executed a Settlement Agreement and Release ("Settlement Agreement") to resolve the litigation.[5]  The Court granted final approval of the Settlement Agreement on March 14, 2024.[6]  Under the terms of the Settlement Agreement, Kroll was appointed as the "Settlement Administrator" and tasked with a range of responsibilities, including the dissemination of notice to the class and the evaluation of claims for reimbursement.[7]

Although the Settlement Agreement provides that Kroll's determinations regarding the validity of submitted claims are final,[8] it also imposes numerous obligations on Kroll in

---

[2] National Fire has attached its proposed complaint in intervention in the accompanying Appendix, which National Fire respectfully requests permission to file if the Court grants its motion.  *See* Proposed Complaint in Intervention, Exhibit 2, Appx. at 63-80.
[3] *See* Complaint, ECF No. 1.
[4] *See* Order, ECF No. 36.
[5] *See* Settlement Agreement, ECF No. 117.1.
[6] *See* Memorandum Opinion and Order, ECF No. 129 at 14-15.
[7] *See* Settlement Agreement, ECF No. 117.1 at Sections 4.1 and 7.4.
[8] *See id.* at Section 7.4.

connection with the claims administration process.  Specifically, Kroll is required to "perform the functions and duties necessary to effectuate the Settlement and as specified in [the Settlement] Agreement,"[9] and to "determine[e] the validity of . . . all Claims submitted by Settlement Class Members."[10]  Additionally, the Settlement Agreement obligates Kroll to carry out "any function related to Settlement administration at the agreed-upon instruction of Class Counsel or Kimberly-Clark's Counsel."[11]

Pursuant to the Settlement Agreement, the Court retained jurisdiction over the administration, implementation, and enforcement of the Settlement Agreement, as well as over all issues and disputes involving Kroll.[12]  Furthermore, in its Memorandum and Opinion and Order granting approval of the Settlement Agreement, the Court expressly reserved continuing jurisdiction over the action, the Parties, their counsel, and all Settlement Class Members for all matters relating to the Settlement.[13]  This continuing jurisdiction includes, without limitation, matters concerning the interpretation, scope, implementation, and enforcement of the Settlement Agreement.[14]

### B.    The Class Action Settlement Insurance Policy

Shortly after the Settlement Agreement was finalized, National Fire issued a Class Action Settlement Insurance Policy (the "Policy") to Kimberly-Clark, effective September 22, 2023.[15] The Policy provides coverage for Loss up to an Aggregate Limit of Liability of $13,500,000.[16]

---

[9] *Id.* at Section 8.1
[10] *Id.* at Section 8.1(g).
[11] *Id.* at Section 8.1(l).
[12] *See id.* at Section 9.4.
[13] *See* Memorandum Opinion and Order, ECF No. 129 at 15.
[14] *See id.*
[15] *See* Policy, Exhibit 3, Appx. at 81-140.
[16] *See id.* at 2, 4, Appx. at 84, 86.

The Policy defines "Loss" to include the total amount payable for Valid Claims.[17]  The Policy requires Kimberly-Clark, among other obligations, to cause Kroll to provide National Fire "with all information, assistance, and cooperation" that National Fire may reasonably require.[18] Additionally, the Policy expressly states that it does not provide coverage for any matters that would violate United States laws or regulations concerning trade or economic sanctions.[19]

### C.    The Unprecedented Surge of Programmatic Fraud in Class Action Claims Administration

While Kroll was administering claims under the Settlement Agreement, the class action settlement landscape experienced an unprecedented surge in programmatic fraud.  Although fraudulent claims have long been a challenge in class action settlements, the scale and sophistication of the problem have grown exponentially in recent years.[20]  In fact, research has revealed that more than 80 million settlement claims submitted in 2023 exhibited significant indicators of fraud—representing a staggering 19,000% increase since 2021.[21]  This dramatic escalation is largely attributed to ongoing advances in artificial intelligence and the increasing activity of cybercriminals, suggesting that the issue of fraudulent claims will only intensify in the future.

In the context of class action lawsuits, "programmatic fraud" refers to large-scale, technologically-driven schemes to submit fraudulent claims.  A prominent example is "bot

---

[17] *See id.* at 15, Appx. at 97.  The Policy defines a "Valid Claim" as "any Claim that is consistent with the terms and conditions of a Claim under the Settlement Agreement, is submitted to [Kroll] during the Claim Reporting Period, is reported to the Insurer pursuant to Section VI(b) of this Policy, is not otherwise excluded by this Policy, and arose as a direct result of an event that occurred prior to the Coverage Expiration Date." *Id.* at 17, Appx at 99.

[18] *See id.* at 10, Appx. at 92.  The Policy specifies that "[s]uch information, assistance, and cooperation [is] necessary for [National Fire] to manage its obligations under the Policy." *Id.*

[19] *See id.* at 12, Appx. at 94.

[20] *See* Western Alliance Bank and Digital Disbursements, "*2024 Annual Report: Digital Payments in Class Actions and Mass Torts*," April 2024, Exhibit 4, Appx. at 141-173.

[21] *See id.* at 3, Appx. at 144.  This data came from 597 class action and mass tort cases that used 24 different settlement administrators.  *See id.*

fraud," where automated software (bots) is used to file false claims or to artificially inflate

participation numbers.  These bots have become adept at evading traditional fraud detection

measures.  As one claims administrator described, "[w]hat happened about eight to ten months

ago [in 2023] is the onset of bot-filed, fraudulent claims[.]  You would do the notice and you'd

get a dozen claims the first week, 70,000 claims the second week, 350,000 claims the third week.

It's just stunning."[22]

In 2024, Reuters interviewed attorneys and claims administrators, concluding that

"[f]raudulent claims have exploded in the last year, siphoning money out of settlements and

threatening the class action system itself."[23]  Chris Chorba, an attorney at Gibson, Dunn &

Crutcher—the firm representing Kimberly-Clark in the Armstrong litigation—warned that

fraudulent claims pose "an existential threat to the whole process."[24]  Similarly, Angeion Group,

LLC, another claims administrator, observed that many fraudsters may be state-sponsored or part

of international criminal cartels:

> [i]n recent times, cyber criminals and fraudulent actors have utilized
> a variety of increasingly sophisticated technologies and techniques
> in their attempt to perpetuate fraud in class action settlements.  Many
> of these criminals may be state-sponsored or otherwise instigated by
> nefarious domestic or international cartels.[25]

Another class action attorney attributed the rise in programmatic fraud to "a combination

of a relatively small number of bad actors using the force multipliers of AI and everything the

internet has to offer."[26]  With the "advancing sophistication of fraudulent claimants and the use

---

[22] Epiq Systems, *Increase of Fraudulent Claims is 'Stunning,'* 2024, Exhibit 5 at 1, Appx. at 175.
[23] Reuters, *Scammers Flood US Class Action Settlements with Fraudulent Claims,* May 7, 2024, Exhibit 6 at 3, Appx. at 180.
[24] *Id.*
[25] Angeion Group, *Angeion Group Introduces First of Its Kind Real-Time Fraud Detection System,* October 3, 2023, Exhibit 7 at 1, Appx. at 183.
[26] Amanda Bronstad, *'Barrage of Suspect Claims' Hampers Altria Class Settlement with Juul Users,* Law.com, March 6, 2024, Exhibit 8 at 2, Appx. at 188.

6

of AI technologies," fraudulent claims are, unfortunately, becoming the new normal in consumer class action settlements.[27]   According to a class action notice expert, claims administrators are struggling to keep pace with the evolving threat: "We've created a very difficult challenge. The risk is great that we're not catching this."[28]

### D.     Kimberly-Clark and National Fire Express Concerns Regarding Kroll's Proposed Findings

On April 23, 2024, Kroll reported the results of its analysis of 3,127,761 claims submitted under the Settlement Agreement.[29]   Rather than identifying a definitive number of valid claims, Kroll presented three possible outcomes based on different validation "thresholds:" (a) 663,427 valid claims, (b) 837,534 valid claims, or (c) 1,254,281 valid claims.[30]   Unexpectedly, Kroll delegated the decision on which threshold to adopt to the Class and Kimberly-Clark, rather than making a recommendation itself.[31]

On April 30, 2024, counsel for Kimberly-Clark responded, referencing National Fire's reports of unprecedented fraud levels across class actions, and expressing significant concerns about Kroll's validation methodology.   Kimberly-Clark questioned whether limiting validation to a subset of claims was sufficient to prevent fraudulent payments and advocated for additional verification measures for the 663,427 claims Kroll appeared ready to deem valid:

> Our insurer has reported that the level of fraud they are seeing across all class actions is currently unprecedented.   We don't think we can be confident that limiting the validation to a subset of the claims is sufficient to ensure that there aren't fraudulent claims being paid.   We believe the fairest and most appropriate approach is to

---

[27] *Id*. at 4, Appx. at 190.
[28] Reuters, *The Class Action Claim Bots Are Coming! (Actually, They're Already Here)*, January 18, 2018, Exhibit 9 at 2, Appx. at 194.
[29] *See* Email dated April 23, 2024, Exhibit 1 at Ex. A at 34-35, Appx. at 57-58.
[30] *See id*.
[31] *See id*.

require the 663,427 remaining claims to verify that they are legitimate class members.[32]

Kroll declined this request for further fraud detection testing on the purportedly valid claims.

National Fire continued to express concern that Kroll's fraud detection methods were not keeping pace with the increasingly sophisticated tactics employed by fraudsters. On August 6, 2024, Kimberly-Clark's counsel forwarded to Kroll, the request of National Fire's for access to the books and records related to all submitted claim files.[33] National Fire hoped that the results of its audit of these records would inform Kroll's claim validation process. However, Kroll again refused the request.

On March 21, 2025, after learning that Kroll was nearing a recommendation to validate nearly 700,000 of the 3,127,704 submitted claims, National Fire sent a letter to Class Counsel and Kimberly-Clark reiterating its concerns about Kroll's fraud detection methods and the anomalous nature of its findings.[34] The letter highlighted that Kroll's conclusion—that over 22% of submitted claims were valid—was thousands of times higher than the percentage of valid claims found in recent, comparable class action settlements.[35]

The letter referenced *Kurtz v. Kimberly-Clark Corp.*, No. 14-cv-1142 (E.D.N.Y.), a class action involving purchasers of Kimberly-Clark-manufactured flushable wipes.[36] There, the settlement administrator concluded that only 440 (~0.05%) of the 852,259 submitted claims were valid, while 851,819 (~99.9%) were invalid. The court noted, based on the administrator's declaration, that "the majority of the [invalid] claims were deemed to likely be submissions by

---

[32] *See* Email dated April 30, 2024, Exhibit 1 at Ex. A at 34, Appx. at 57.
[33] *See* Email dated August 6, 2024, Exhibit 1 at Ex. A at 22-23, Appx. at 45-46.
[34] *See* Letter dated March 21, 2025, Exhibit 10, Appx. at 195-199.
[35] *See id.* at 1, Appx. at 196.
[36] *See id.* at 1-2, Appx. at 196-197.

'bots.'"[37]  The similarity of the products and class in *Kurtz* makes its results particularly instructive.

The letter also cited *Jimenez v. Artsana USA, Inc.*, No. 21-cv-7933 (S.D.N.Y.), another class action in which Gibson Dunn—the firm representing Kimberly-Clark in the Armstrong litigation—raised concerns about "programmatic fraud" and bot-driven claim submissions.[38] Recognizing the issue as "cutting edge" and "kind of unprecedented," the court in *Jimenez* declined to approve the class settlement without a clear understanding of the number of valid claimants and assurances that settlement funds would primarily benefit legitimate claimants.[39] Ultimately, more than 99 percent of the 8,984,360 submitted claims were deemed fraudulent.[40]

Given the stark contrast between Kroll's findings and those in comparable cases, National Fire proposed that the Class and Kimberly-Clark jointly instruct Kroll to implement one of two additional fraud detection methods.[41]  National Fire offered to cover all associated costs, agreed not to contest the results, and committed to not requesting any further fraud detection measures.[42]  Despite these assurances, neither the Class nor Kimberly-Clark responded to National Fire's proposal.

### E.    Fraud Expert Corroborates National Fire's Concerns

After receiving no response to the issues raised in its March 21 letter, National Fire retained Mr. Heller to independently assess Kroll's proposed findings and to evaluate the adequacy of Kroll's fraud detection methodology under the Settlement Agreement.[43]  Mr. Heller

---

[37] Memorandum and Order, Exhibit 11 at 10 n. 11, Appx. at 210.
[38] Transcript, Exhibit 12 at 23 Appx. at 264.
[39] *Id.* at 33-34 Appx. at 274-275.
[40] *See* Heller Decl., Exhibit 1 at 15, Appx. at 16.
[41] *See* Letter dated March 21, 2025, Exhibit 10 at 3, Appx. at 198.
[42] *See id.*
[43] *See* Heller Decl., Exhibit 1 at ¶ 1, Appx. at 3.

is the Co-Founding Partner and Chief Operating Officer of ClaimScore, a legal technology firm specializing in advanced data analysis and pattern recognition to assist claims administrators in detecting fraudulent activity in class action settlements.[44]

Mr. Heller and ClaimScore bring substantial expertise to this review. Over the past two years, ClaimScore has served as the designated "fraud expert" in more than 30 large-scale class action settlements.[45] ClaimScore's work spans the full lifecycle of class action claims administration, including engagements at the outset of a matter, during the claims process, and—critically, as in this instance—after the claims period has closed, when all claims have been submitted and are available for comprehensive review.[46] Notably, ClaimScore has previously been retained in similar circumstances, such as in the *Jimenez* matter referenced above, to conduct its proprietary Advanced AI Analysis on submitted claims and to provide the claims administrator and parties with detailed recommendations regarding the validity of each claim.[47]

Upon reviewing Kroll's proposed findings and conducting a thorough analysis and testing of Kroll's fraud detection methodology, Mr. Heller identified significant deficiencies in Kroll's approach. He concluded that these flaws would likely result in the validation of nearly half a million fraudulent claims, potentially leading to the disbursement of millions of dollars to ineligible or fraudulent claimants.[48] Mr. Heller further advised that, if provided with the underlying Armstrong claims data, ClaimScore could, within 30 days, apply its Advanced AI Analysis to deliver a precise determination of the number of fraudulent claims it detected.[49] This

---

[44] *See id*.
[45] *See id*. at ¶ 13, Appx. at 6-7.
[46] *See id*. at ¶ 17, Appx. at 7-8.
[47] *See id*. at ¶ 19, Appx. at 9.
[48] *See id*. at ¶ 6, Appx. at 4.
[49] *See id*. at ¶ 8, Appx. at 5.

analysis would include a detailed evidentiary basis for each fraud determination, providing Kroll, the parties, and the Court with a reliable and transparent assessment of claim validity.[50]

### 1. The Settlement presents a significant risk of fraudulent claims

The Settlement Agreement incorporated an "indirect notice" provision because the parties lacked contact information for each individual purchaser of the relevant Cottonelle Flushable Wipes.[51] Consequently, any purported class member could submit a claim by simply completing a basic claim form to receive a monetary payment.[52] According to Mr. Heller, settlements structured in this manner—with minimal verification requirements—are particularly vulnerable to fraudulent activity.[53] These vulnerabilities are often exploited by individuals and organizations engaging in large-scale, technologically-driven fraud, commonly referred to as programmatic fraud.[54]

Mr. Heller has extensive experience observing and analyzing claim fraud in similar class action settlements. He has noted a marked increase in the prevalence and sophistication of programmatic fraud in recent years.[55] Fraudsters are continually refining their techniques, leveraging advanced technology to submit large volumes of fraudulent claims that can be difficult to detect using traditional methods.[56] Based on the complexity and scale of the fraudulent activity he has encountered, Mr. Heller believes that much of this fraud is orchestrated by organized groups, including international actors, rather than isolated individuals.[57]

---

[50] *See id.*
[51] *See id.* at ¶ 2, Appx. at 3.
[52] *See id.*
[53] *See id.*
[54] *See id.*
[55] *See id.* at ¶ 3, App. at 3-4.
[56] *See id.*
[57] *See id.*

Given these factors, Mr. Heller has concluded that the Settlement in the instant case is an especially attractive target for fraudulent actors.[58]  The combination of the indirect notice component and low barriers to claim submission creates an environment in which large-scale fraud can flourish unless robust and sophisticated fraud detection measures are implemented.

### 2. Kroll's rule-based methodology is fundamentally flawed and ineffective against sophisticated programmatic fraud

Mr. Heller has identified significant shortcomings in Kroll's fraud detection methodology, which relies primarily on a basic rule-based approach known as a "group and slash" analysis.[59]  Under this system, Kroll applies a series of isolated, one-off criteria to evaluate the validity of each claim.[60]  The inherent flaw in this methodology is that it treats each criterion as a standalone test: unless a claim clearly fails a specific criterion, it is generally approved—even if, when considered collectively, the claim exhibits multiple warning signs indicative of fraud.[61]

Mr. Heller explains that the landscape of fraudulent activity in class action settlements has evolved rapidly, with perpetrators employing increasingly sophisticated, technology-driven schemes.[62]  These actors are adept at designing their submissions to evade detection by targeting and circumventing the most common, predictable criteria used in rule-based systems.[63]  As a result, if a fraudulent claim can pass the limited set of checks imposed by Kroll's methodology, it is likely to be approved, regardless of other suspicious characteristics present in the submission.[64]

---

[58] *See id.* at ¶ 2, Appx. at 3.
[59] *See id.* at ¶¶ 38, 48-60, Appx. at 13, 17-21.
[60] *See id.* at ¶ 36, 50, Appx. at 12-13, 17.
[61] *See id.* at ¶¶ 39-40, Appx. at 13-14.
[62] *See id.* at ¶ 3, Appx. at 3-4.
[63] *See id.* at ¶ 40, Appx. at 13-14
[64] *See id.*

12

This single-point, rule-based approach is no longer sufficient in the face of modern programmatic fraud. According to Mr. Heller, the methodology fails to account for the cumulative effect of multiple, less obvious red flags that, when viewed together, strongly suggest fraudulent activity.[65] By focusing only on individual criteria in isolation, Kroll's system routinely overlooks complex fraud schemes that exploit the gaps between these narrowly defined rules.

### 3. Kroll's flawed methodology risks the validation of nearly half a million fraudulent claims, resulting in millions in improper payments

Mr. Heller's analysis indicates that Kroll's rule-based "group and slash" methodology is not only conceptually flawed, but also poses a significant financial risk by allowing the approval of a substantial volume of fraudulent claims. Drawing on ClaimScore's extensive experience with similar class action settlements, Mr. Heller estimates that Kroll's approach will likely fail to detect nearly 500,000 fraudulent claims, leading to the improper disbursement of approximately $2,500,000 to fraudulent actors.[66]

To rigorously assess the effectiveness of Kroll's methodology, Mr. Heller conducted a comparative analysis using a representative dataset of 38 million claims from ClaimScore's proprietary database.[67] This dataset was specifically selected for its similarity to the claims at issue in the current matter.[68] By applying Kroll's "group and slash" criteria to this historical data, Mr. Heller was able to determine how many claims previously identified as fraudulent

---

[65] *See id.* at ¶¶ 40-45, Appx. at 13-15.
[66] *See id.* at ¶ 53, Appx. at 18. Based on his experience, Mr. Heller also believes that, of the claims submitted with alleged proof of purchase that Kroll intends to recommend as valid, ~60% are likely fraudulent. *See id.* at ¶ 7, Appx. at 4-5. That recommendation would likely result in approximately $2.5 million in additional claim payments to fraudulent actors. *See id.*
[67] *See id.* at ¶¶ 54-55, Appx. at 18-19.
[68] *See id.*

would have been incorrectly validated as legitimate under Kroll's system.[69]  This direct, data-driven approach provided a clear measure of the methodology's reliability and accuracy in detecting fraud.

The results of this analysis were compelling and concerning.  Between 72% and 75% of the claims that would have been approved by Kroll's three "group and slash" models were, in reality, fraudulent.[70]  In practical terms, this means that if Kroll's methodology had been used to review the historical dataset, it would have erroneously validated more than 4.5 million fraudulent claims.[71]  When these findings are extrapolated to the instant class action, the implication is that Kroll's process would likely approve nearly 500,000 fraudulent claims, resulting in millions of dollars in improper payments.[72]

These findings underscore the critical shortcomings of Kroll's methodology.  By relying on a limited set of isolated criteria, the "group and slash" approach fails to identify the vast majority of sophisticated fraudulent claims, resulting in the payment of millions of dollars to fraudulent actors and undermining the integrity of the claims process.

### 4.  ClaimScore can deliver a precise fraud determination within 30 days using Advanced AI Analysis

ClaimScore is prepared to deliver a comprehensive and precise determination of fraudulent claims within 30 days of receiving the Armstrong claims data.[73]  Upon receipt, ClaimScore will apply its Advanced AI Analysis to the entire dataset and provide Kroll, the

---

[69] *See id*. at ¶¶ 54-61, Appx. at 18-21.
[70] *See id*. at ¶ 55, Appx. at 18-19.
[71] *See id.*
[72] *See id*. at ¶ 60, Appx. at 21.
[73] *See id*. at ¶ 63, Appx. at 21.

14

parties, and the Court with a detailed report identifying the exact number of fraudulent claims it detected, along with the specific evidentiary basis supporting each fraud determination.[74]

Unlike Kroll's single-point, rule-based methodology, ClaimScore's Advanced AI Analysis employs a sophisticated, multi-factor expert system AI algorithm.[75] This system evaluates and scores each claim across more than 65 distinct validation criteria, emulating the nuanced approach that human experts use when assessing complex data.[76] Rather than relying on isolated data points, ClaimScore's methodology considers the totality of the circumstances, ensuring that no single failed criterion automatically disqualifies a claim.[77] This holistic approach enables the detection of fraud even in cases where no individual piece of evidence would be sufficient to reject a claim under traditional models.[78]

ClaimScore's adaptive scoring system is designed to evolve in response to real-world data, making it highly resistant to reverse-engineering by fraudulent actors.[79] While traditional "one-off" methods typically rely on a checklist of about 25 criteria—creating vulnerabilities that sophisticated fraudsters can exploit—ClaimScore's system evaluates each claim against more than 65 criteria, resulting in over 35 quintillion unique scoring combinations.[80] This immense combinatorial complexity establishes a multi-dimensional validation structure that cannot be circumvented by manipulating any single factor.[81]

Importantly, ClaimScore's methodology is both rigorous and transparent.[82] Every deduction or exclusion is meticulously tagged and traceable, ensuring that each rejection is not

---

[74] *See id.*
[75] *See id.* at ¶ 38, Appx. at 13.
[76] *See id.* at ¶ 41, Appx. at 14.
[77] *See id.*
[78] *See id.* at ¶ 42, Appx. at 14-15.
[79] *See id.*
[80] *See id.*
[81] *See id.*
[82] *See id.* at ¶ 43, Appx. at 15.

only statistically sound but also fully defensible in legal proceedings.[83]  The system's evidence-based framework provides clear documentation for every decision, supporting the integrity and reliability of the claims process.[84]

ClaimScore's track record demonstrates its effectiveness: when engaged to review claims after an initial administrator's review, ClaimScore has consistently identified significantly more fraudulent claims, preventing millions of dollars from being disbursed to sophisticated organizations that target class action settlements.[85]  This proven precision underscores ClaimScore's ability to prevent payments to fraudulent actors, thereby upholding the fairness of the claims process.

### F.  The Parties and Kroll Decline to Address Substantial Fraud Concerns

On May 5, 2025, counsel for National Fire provided the Class, Kimberly-Clark, and Kroll with Mr. Heller's declaration and formally requested that the Class and Kimberly-Clark instruct Kroll to permit ClaimScore to conduct its Advanced AI Analysis.[86]  National Fire made clear that ClaimScore could complete its analysis within 30 days and offered to pay all associated costs, ensuring that the process would not delay the administration or impose any financial burden on the settlement fund or the parties.[87]  The intent behind this request was to allow Kroll to incorporate the results of ClaimScore's analysis into its final claim validation determination, thereby enhancing the accuracy and integrity of the process.

Importantly, Section 8.1(l) of the Settlement Agreement expressly authorizes the parties to direct Kroll to "perform any function related to Settlement administration at the agreed-upon

---

[83] *See id.*
[84] *See id.*
[85] *See id.* at ¶¶ 44-47, Appx. at 15-17.
[86] *See* Letter dated May 5, 2025, Exhibit 13, Appx. at 313-315.
[87] *See id.* at 2, Appx. at 315.

instruction of Class Counsel or Kimberly-Clark's Counsel."[88]  This provision provided a clear procedural mechanism for the parties to address the significant fraud concerns raised by Mr. Heller's declaration and to ensure that all available tools were utilized to protect the integrity of the claim process.

Despite these efforts, on May 9, 2025, Class Counsel sent a letter declining National Fire's request.[89]  Shortly thereafter, on May 12, 2025, counsel for Kimberly-Clark also sent a letter declining to permit ClaimScore's involvement.[90]  As a result, neither the Class nor Kimberly-Clark took any action to address the substantial fraud concerns identified, nor did they authorize Kroll to utilize ClaimScore's advanced analytical capabilities.  This refusal occurred despite the availability of a cost-free, timely, and technologically advanced solution that could have materially improved the accuracy and defensibility of the claims validation process.

## III.  ARGUMENTS AND AUTHORITIES

Federal Rule of Civil Procedure 24 governs a party's intervention in a pending lawsuit in federal court.  Rule 24(a) governs intervention as of right, while Rule 24(b) governs permissive intervention.  "Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed."[91]  Intervention should be allowed "where no one would be hurt

---

[88] ECF No. 117.1 at Section 8.1(l).
[89] *See* Letter dated May 9, 2025, Exhibit 14, Appx. at 316-318.
[90] *See* Letter dated May 12, 2025, Exhibit 15, Appx. at 319-322.
[91] *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015) (quoting *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014)).

and *greater justice could be attained."*[92]  The inquiry is a flexible one, and a practical analysis of the facts and circumstances of each case is appropriate.[93]

### A.  National Fire Is Entitled to Intervene as of Right

Under Rule 24(a), the Court "must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[94]  To obtain intervention as of right, National Fire must satisfy the following four-prong test:

1. The application must be timely;

2. The applicant must have an interest relating to the property or transaction which is the subject of the action;

3. The applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and

4. The applicant's interest must not be adequately represented by the existing parties to the suit.[95]

Here, National Fire satisfies each criterion.  As a result, the Court should grant this motion and permit National Fire to intervene as of right under Rule 24(a).

### 1.  National Fire's motion is timely

The first prong of the test is the timeliness of the motion to intervene.  The Fifth Circuit long ago rejected "absolute" measures of timeliness, such as whether the intervention motion came before or after a certain event.[96]  Instead, the timeliness inquiry is contextual and should be determined based on all the circumstances, rather than merely from chronological

---

[92] *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (emphasis added) (quoting *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970)
[93] *Brumfield v. Dodd*, 749 F.3d at 342
[94] Fed. R. Civ. P. 24(a)(2).
[95] *WalMart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citations omitted)
[96] *Stallworth v. Monsanto Co.*, 558 F.2d 257, 266 (5th Cir. 1977).

considerations.[97]  The Fifth Circuit considers a number of factors in deciding whether a motion to intervene is timely:  (1) the length of time the intervenor knew or should have known of its interest in the case; (2) prejudice to the existing parties resulting from the intervenor's failure to apply for intervention sooner; (3) prejudice to the intervenor if its application for intervention is denied; and (4) the existence of unusual circumstances.[98]

- **Length of time** – The first factor weighs in favor of National Fire.  For purposes of this factor, the timeliness of a motion to intervene is measured from the point at which the movant becomes aware that its interests are no longer adequately protected by the existing parties to the litigation.[99]  As detailed above, National Fire had communicated its concerns regarding potential fraud to both Kroll and Kimberly-Clark over the course of several months while Kroll was still in the process of finalizing its claim determination.  Because Kroll had not yet reached a final determination, National Fire maintained hope that Kroll would agree to implement additional fraud detection measures prior to finalizing its review.

However, in their letters dated May 9 and May 12, 2025, counsel for the Class and for Kimberly-Clark unequivocally stated that they would not instruct Kroll to utilize ClaimScore or any other supplemental fraud detection methods.[100]   Only after receiving these definitive responses did National Fire become aware that its interests would not be protected by the existing parties.  Ten days later, National Fire promptly filed its motion to intervene, making its application timely under this standard.[101]

---

[97] *See WalMart Stores, Inc*., 834 F.3d at 565-66.

[98] *See Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp*., 332 F.3d 815, 822 (5th Cir. 2003).

[99] *See, e.g., Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996); *Espy*, 18 F.3d at 1206 (holding that the appropriate "gauge of promptness is the speed with which the would-be-intervenor acted when it became aware that its interests would no longer be protected by the original parties").

[100] *See* Letters dated May 9, 2025 and May 12, 2025, Exhibits 14 and 15, Appx. at 316-318 and 319-322.

[101] *See, e.g., Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318, 321 (5th Cir. 1986) (intervention five months after arbitration decision considered timely); *Diaz v. S. Drilling Corp*., 427 F.2d 1118, 1125 (5th Cir. 1970) (intervention one year after completion of discovery and pretrial motions considered timely).

- **Prejudice to existing parties** – The second factor likewise supports National Fire's position. The central inquiry under this factor is whether the existing parties have suffered any prejudice as a result of the intervenor's delay in seeking intervention. In this case, there is no indication that National Fire's timing has caused any harm or disadvantage to the existing parties. Because Kroll has not yet finalized its claim determination, the status of the proceedings remains unchanged, and no substantive rights or positions have been altered or compromised due to National Fire's timing. Accordingly, National Fire's failure to intervene at an earlier stage has not—and could not have—resulted in any prejudice to the existing parties.

- **Prejudice to National Fire** – The third factor similarly weighs in favor of National Fire. As previously discussed, Kroll's current "group and slash" methodology is highly likely to result in the erroneous validation of hundreds of thousands of fraudulent claims. This flawed approach significantly increases the risk that a substantial number of illegitimate claims will be approved. In turn, Kimberly-Clark will almost certainly seek to hold National Fire responsible for payment of these fraudulent claims under the Policy. According to Mr. Heller's assessment, the potential exposure could reach into the millions of dollars. Thus, the third factor underscores the substantial and direct financial risk to National Fire, further supporting its position.

- **Existence of unusual circumstances** – The fourth factor also weighs in favor of National Fire. The refusal of the existing parties to jointly instruct Kroll to utilize ClaimScore or implement other enhanced fraud detection measures—despite clear evidence of anomalous results—constitutes an extraordinary circumstance. Under Section 8.1(l) of the Settlement Agreement, the parties possess the authority to direct Kroll to adopt such additional safeguards,

yet they have declined to exercise this power.[102]  This refusal may be motivated by the belief that National Fire alone will bear the financial burden of paying fraudulent claims.

A second unusual circumstance arises from the risk of fraud being perpetrated on the Court itself.  If Kroll is permitted to recommend payment of millions of dollars to fraudulent claimants—including, potentially, state-sponsored or international criminal organizations—the integrity of the judicial process is directly threatened.  As the courts have recognized, they are "institutions in which fraud cannot complacently be tolerated consistent with the good order of society."[103]  Moreover, "tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public."[104]

In light of these extraordinary circumstances—the parties' refusal to implement available fraud prevention tools and the grave risk of undermining the judicial process—the timeliness of National Fire's motion is amply supported.

2.      **National Fire possesses a protectable interest in the subject matter of this lawsuit**

The second prong of the test requires a showing that National Fire possesses a sufficient interest in the property or transaction that forms the subject matter of this litigation.  To intervene as of right, a movant must demonstrate a "legally protectable interest," which courts have defined as an interest that the law recognizes as worthy of protection, even if the intervenor lacks an enforceable legal entitlement or would not have standing to bring an independent claim.[105] Courts approach this requirement pragmatically, treating the "interest" test as a practical guide

---

[102] *See* Settlement Agreement, ECF No. 117.1 at Section 8.1(l).
[103] *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 246 (1944).
[104] *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991) (citation omitted).
[105] *Texas*, 805 F.3d at 659.

designed to ensure that all parties with a significant stake in the outcome are included, so long as doing so is consistent with judicial efficiency and due process.[106]

Here, National Fire, as the insurer that has agreed to pay Valid Claims under the Policy—subject to its terms and conditions—clearly qualifies as a real party in interest. The Fifth Circuit has expressly found insurers similar to National Fire to be real parties in interest for purposes of intervention.[107] Because National Fire has a direct, substantial, and legally protectable economic interest in the outcome of this litigation, it has satisfied the second prong of the intervention test.

### 3.     Denying intervention will impair National Fire's interest

The third prong of the intervention test examines whether the disposition of this lawsuit will, as a practical matter, impair or impede National Fire's ability to protect its interests. This is fundamentally a practical inquiry, not a technical legal one.[108] The impairment requirement under Rule 24(a) focuses on the real-world consequences of denying intervention.[109] The Fifth Circuit has emphasized that courts should consider whether a judgment will affect the movant and whether, due to the precedential effect of the district court's decision, an adverse outcome would hinder the movant's ability to safeguard its interests.[110]

In this case, National Fire's interests are directly threatened by its inability to address concerns regarding Kroll's likely validation of hundreds of thousands of fraudulent claims. Although the Settlement Agreement states that Kroll's decisions regarding the validity of

---

[106] *Espy*, 18 F.3d at 1207.
[107] *See, e.g., Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005) (finding that an insurer's "financial stake in securing a favorable outcome for its insured in a lawsuit alleging potentially covered claims" is a sufficient interest to allow an insurer to intervene as a matter of right); *Labrew v. A&K Truckline, Inc.,* No. 2:23-CV-079-Z-BR, 2023 U.S. Dist. LEXIS 201420, at *11-12 (N.D. Tex. Nov. 9, 2023) (granting insurer's motion to intervene). (granting insurer's motion to intervene).
[108] *Swann v. City of Dallas*, 172 F.R.D. 211, 213-214 (N.D. Tex. 1997).
[109] *In re Lease Oil Antitrust Litig*., 570 F.3d 244, 251 (5th Cir. 2009) ("[A] practical harm to Texas's property interest . . . is sufficient to show impairment.").
[110] *See Espy*, 18 F.3d at 1207.

submitted claims are final,[111] it also imposes clear duties on Kroll: (1) to perform all functions and duties necessary to effectuate the Settlement as specified in the Settlement Agreement;[112] (2) to determine the validity of all claims submitted by Settlement Class Members;[113] and (3) to perform any function related to Settlement administration at the direction of Class Counsel or Kimberly-Clark's Counsel.[114]   Mr. Heller's declaration demonstrates that Kroll has failed to fulfill these obligations.  If left unaddressed, Kroll is likely to recommend payment of millions of dollars in fraudulent claims.  While the parties have both the right and the ability to require Kroll to take additional steps to identify fraudulent claims,[115] they have declined to do so.

This Court expressly retained jurisdiction over this action, the parties, their counsel, and the Settlement Class Members to address precisely these types of issues.[116]   The Settlement Agreement specifically provides the Court with jurisdiction over all questions and disputes related to Kroll.[117]   Denying National Fire's motion to intervene would leave these significant concerns unresolved and would plainly impair National Fire's interests.  This is more than sufficient to satisfy the impairment element of the intervention test.

### 4.     The existing parties have refused to adequately protect National Fire's interest

The fourth prong of the intervention test considers whether the existing parties adequately represent National Fire's interests. To satisfy this requirement, National Fire need only

---

[111] *See* Settlement Agreement, ECF No. 117.1 at Section 7.4.
[112] *Id.*
[113] *See id.* at Section 8.1(g).
[114] *See id.* at Section 8.1(l).
[115] *Id.*
[116] *See* Memorandum Opinion and Order, ECF No. 129 at 15.
[117] *See* Settlement Agreement, ECF No. 117.1 at Section 9.4.

demonstrate that the current representation of its interests by the existing parties *may* be inadequate—a burden that is "minimal."[118]

As previously discussed, none of the parties currently before the Court has any incentive to protect National Fire's interests.  This is further evidenced by the parties' correspondence dated May 9 and 12, 2025, in which they expressly refused to address National Fire's substantial concerns regarding Kroll's apparent claim validation findings.[119]  The parties' unwillingness to engage with these issues underscores the inadequacy of their representation of National Fire's interests.

Accordingly, National Fire has more than met its burden with respect to this final prong of the intervention test.

### B.     Alternatively, the Court Should Permit National Fire to Intervene Under Rule 24(b).

Federal Rule of Civil Procedure 24(b)(1) provides that a court may permit intervention by anyone who either (A) is granted a conditional right to intervene by a federal statute, or (B) asserts a claim or defense that shares a common question of law or fact with the main action.[120] The decision to allow permissive intervention rests entirely within the discretion of the district court, even where a common question of law or fact exists or the other requirements of Rule 24(b) are satisfied.[121]

In this case, there are clear common questions of law and fact between National Fire's obligation to pay Valid Claims under the Policy and the existing parties' responsibility to ensure

---

[118] *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538-39 & n.10 (1972), *accord Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 196 (2022).
[119] *See* Letters dated May 9, 2025 and May 12, 2025, Exhibits 14 and 15, Appx. at 316-318 and 319-322.
[120] Fed. R. Civ. P. 24(b).
[121] *See New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 470-71 (5th Cir. 1984) (quoting Wright & Miller, Federal Practice and Procedure: Civil § 1913 at 551)).

that any settlement payments to purported class members are legitimate, made in accordance with the Settlement Agreement, and not directed to fraudulent actors.  Permitting National Fire to intervene will not result in undue delay or prejudice to the adjudication of the parties' rights.  On the contrary, intervention will serve the important purpose of safeguarding the integrity of the legal system and the class action claims process.

Accordingly, if the Court determines that intervention as of right under Rule 24(a) is not warranted, it should, in the exercise of its sound discretion, grant National Fire permissive intervention under Rule 24(b).

## IV.   REQUEST FOR ORAL ARGUMENT

To the extent the Court believes it would be helpful, National Fire would welcome the opportunity to participate in oral argument.

## V.   CONCLUSION AND PRAYER

For the foregoing reasons, National Fire respectfully asks the Court to grant its Motion to Intervene, permit National Fire to file its proposed Complaint in Intervention, and provide any other relief the Court deems just and reasonable.[122]

---

[122] *See* Proposed Complaint in Intervention, Exhibit 2, Appx. at 63-80.

25

Dated: May 22, 2025                    Respectfully submitted,


/s/ Daniel D. McGuire
Daniel D. McGuire
State Bar No. 24081282
PIERSON FERDINAND LLP
450 S. Denton Tap Rd. Suite 2211
Coppell, TX 75019
Telephone: (214) 295-7676
dan.mcguire@pierferd.com

and

Andrew D. Shapiro (*pro hac vice* pending)
PIERSON FERDINAND LLP
111 West Jackson, Suite 1700
Chicago, Illinois 60604
Telephone: (312) 248-0165
andrew.shapiro@pierferd.com

and

Marc A. Lindemann (*pro hac vice* pending)
PIERSON FERDINAND LLP
1270 Avenue of the Americas, 7th Floor
New York, New York 10020
Telephone: (646) 347-7952
marc.lindemann@pierferd.com

*Attorneys for Intervenor National Fire & Marine Insurance Company*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2025, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon all counsel of record.

*/s/ Daniel D. McGuire*
Daniel D. McGuire
*Counsel for Intervenor*
